## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

MOORING CAPITAL FUND, LLC,           )
                                     )
                    Plaintiff,       )
vs.                                  )            NO.  CIV-06-0006-HE
                                     )
PHOENIX CENTRAL, INC., ET AL.,       )
                                     )
                    Defendants.      )

## ORDER

Plaintiff Mooring Capital Fund, LLC ("Mooring") filed this action in state court against defendants Phoenix Central Inc. ("Phoenix"), the Cleveland County Treasurer and the Board of County Commissioners of Cleveland County, seeking judgment against Phoenix on a promissory note and to foreclose a mortgage on real property located in Cleveland County.  Phoenix removed the action and counterclaimed against Mooring, asserting claims for breach of contract, tortious breach of contract/bad faith, negligence, tortious interference with business relations, and tortious interference with prospective business relations.[1] Phoenix also requests an accounting or declaration of the amount, if any, it owes the plaintiff.

Mooring has filed a motion seeking summary judgment both on its claims and on Phoenix's counterclaims. Mooring contends that it is entitled to summary judgment on its

---

[1]*Phoenix also cross-claimed against Cleveland County, but that claim was settled. In its  third amended answer and counterclaim Phoenix asserts a claim for tortious interference with prospective business relations.  Mooring treats the claim in its summary judgment motion as one alleging tortious inference with business relations, rather than prospective business relations.  The claims differ, see Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1094 & note 24 (10th Cir. 2006), but the difference is immaterial here, as the court finds the evidence fails to support either tort.*

breach of contract and foreclosure claims as "there is no question that Phoenix is obligated to Mooring under the subject Amended Note and mortgage."  Plaintiff's brief, p. 9.  The defendant's multiple defenses and its multiple claims are, Mooring asserts, without merit.

Phoenix responds that it was excused from continuing to pay down its loan due to Mooring's conduct which, it contends, constituted a material breach of its obligations of good faith and fair dealing under the plan, note and mortgage contracts.  Phoenix asserts that Mooring failed to investigate the balance when informed by Phoenix that it was incorrect, failed to apply its payments properly, failed to provide it with a comprehensive or understandable explanation of how it calculated the payoff balance, and failed to provide accurate payoff balances to two lenders.  Phoenix claims that  Mooring's gross negligence prevented it from refinancing its debt and caused it to lose various business opportunities.

Also pending are various motions in limine which address damages and other issues related to defendant's counterclaims.

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The court has viewed the evidence and any reasonable inferences that might be drawn from it in the light most favorable to the defendant, the nonmoving party. Davidson v. America Online, Inc., 337 F.3d 1179, 1182  (10th Cir 2003).  Having applied the Rule 56 standard to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir.1998) (internal quotation

and citation omitted), the court concludes the plaintiff's motion should be granted in part and denied in part.  The pertinent facts and explanation for the court's decision follow.[2]

## Background

Judith Knight is the sole owner and president of Phoenix, a corporation that owns both a strip shopping center in Norman and a house in Oklahoma City.[3]  In 1992, Central Bank of Oklahoma City loaned Phoenix $400,000, secured by a promissory note and mortgage on the shopping center.[4]  Bank One subsequently acquired the note and mortgage and, after Phoenix defaulted on the loan, obtained a judgment against it.  However, before the bank could execute on its judgment Phoenix filed a Chapter 11 bankruptcy proceeding.  The bankruptcy court confirmed a Plan of Reorganization in 2001.  The Plan modified Phoenix's monthly payment amount and the maturity date of the note and mortgage, but otherwise left intact the terms of the note and mortgage.  Phoenix began making payments on the note, as modified by the plan, to Bank One.  Mooring subsequently acquired the loan in July, 2002.

Phoenix has disputed the payoff balance of the loan since Mooring acquired it.  Judith

---

[2]*Unless otherwise specified, a reference to an "Exhibit" will be to the exhibits submitted with the plaintiff's motion for summary judgment or the defendant's response to that motion.*

[3]*Ms. Knight testified in her deposition that she transferred title to this property, located at 2525 Manchester Drive, to Phoenix but had never recorded the deed.  Plaintiff's Exhibit 10, p. 13. In one of its motions in limine, Mooring states that Phoenix just produced the deed that week.  Mooring challenges its validity, stating that it appears to be or may be a falsified document.*

[4]*In 1993, Phoenix executed an amended promissory note in the amount of $400,000 and also amended the mortgage.  The court will refer to the amended note and mortgage simply as "note" and "mortgage."*

Knight contacted Mooring after receiving its letter dated July 30, 2002, which advised that Mooring had purchased the loan. When she was told that the loan payoff was $288,433.80, Ms. Knight informed Mooring that the balance was incorrect.  *See* defendant's Exhibit 1, Judith Knight affidavit, ¶5; Exhibit 5.  Several entries on Mooring's activity log for the Phoenix loan include statements such as "[Judy Knight] [c]laims the balance we have is wrong," plaintiff's Exhibit 11(C), 02/04/2004 entry, or refer to requests from Phoenix for information pertaining to the loan. *E.g. id.* 10/03/2003 entry.[5]  Phoenix's periodic assertions about the inaccuracy of the loan balance are interspersed with other entries pertaining to Phoenix's failure to make payments on time and its efforts to refinance the loan.  It was not until mid-December, 2004, beginning with a letter and a telephone call from Ms. Knight, that Phoenix became more persistent and adamant in its assertion that Mooring's loan balance was inaccurate. *E.g., id.* entries, 12/14/2004; 12/15/2004/ 2/25/2005; *see also* defendant's Exhibits 13-16.  However, Phoenix never told Mooring what it believed the balance was or specified why it believed the balance was incorrect.[6]

---

[5]*Some documents were sent, e.g., plaintiff's Exhibit 11(C), 10/06/2003 entry ("Sent loan history and related information ...") and Mooring attempted at times to discuss the disputed balance with Phoenix. E.g., id. 07/016/2003 entry ("Left message for Judy to discuss balance due.").*

[6]*Although Phoenix purports to controvert Mooring's assertion in this regard (Mooring brief, Fact 14), it presents no facts (as opposed to rhetoric) to the contrary.  Ms. Knight testified that she never furnished a payment schedule to Mooring before the lawsuit was filed.  Plaintiff's Exhibit 10, p. 91.  When asked if she ever told Mooring how the payments should be applied to principal and interest, Ms. Knight responded: "Why would that be my job to tell a finance company that ... Why would it be my job to tell them how to calculate the loan?"  Id. at p. 92.  She stated that while she could have prepared a schedule explaining how payments should be applied, she did not do that.  Id. at p. 93.*

Phoenix continued to made payments on the note until February, 2005, when it decided to withhold further payments until Mooring determined the correct balance owed. Mooring declared the loan to be in default as of April 8, 2005, and filed this lawsuit. Mooring claims the unpaid balance on the loan as of April 27, 2007, is $259,625.88 with interest accruing at a daily rate of $61.23.   Phoenix contends the current balance is $231,470.51, and notes that Mooring has asserted three different payoff balances since it filed this lawsuit – $363,592.28 (the amount stated in the initial petition filed September 21, 2005); $275,615.35  (the amount stated in the amended complaint  filed July 11, 2006) and now $259,625.88.

After it filed this lawsuit Mooring discovered that it had relied upon an incorrect version of the defendant's confirmed plan of reorganization to determine the amount of the debt.  Two plans captioned as the "Debtor's Fourth Amended Plan of Reorganization," were filed in Phoenix's bankruptcy case --one was filed on July 14, 2000, and the other was filed on January 30, 2001.  Bank One's debt was treated differently in the two plans with respect to the length of the loan and the applicable interest rate.  Although the Plan filed in January 2001 was the confirmed plan, Bank One had sent Mooring the first plan by mistake. Phoenix realized the error in December,  2005, and also discovered in January, 2006, that Phoenix had made $15,000.00 in payments that Bank One had not credited to Phoenix's debt.  Mooring provided an incorrect payoff statement to a potential third party lender, Structured Lending,

---

in April, 2004.

## MOORING'S BREACH OF CONTRACT CLAIM

Mooring asserts that while Phoenix challenges the amount of its indebtedness, it is nonetheless clear that Phoenix owes something to Mooring under the terms of the note as revised by the Plan of Reorganization.[7]  However, the defendant, at least in its summary judgment brief,[8] now argues that Mooring materially breached its obligations under the contract and that the impact of the breach is to excuse altogether any obligation of Phoenix to repay the indebtedness.  The evidence, however, is insufficient to create a justiciable question as to whether Mooring materially breached its contractual obligations within the meaning of the applicable rule.

The law does not automatically relieve a party of its obligation to perform under a contract if the other party breaches in some fashion.  As Williston notes: "However, modern courts, and the Restatement (Second) of Contracts, recognize that something more than a mere default is ordinarily necessary to excuse the other party's performance in the typical situation ....  Thus, if the prior breach of such a contract was slight or minor, as opposed to material or substantial, the nonbreaching party is not relieved of his or her duty of performance, although he or she may recover damages for the breach."  14 <u>Williston on</u>

---

[7]*Once confirmed, the Plan becomes a legally binding contract.* <u>*Xofox Indus. Ltd.,*</u> *241 B.R. 541, 543 (Bankr. E.D.Mich. 1999).*

[8]*Ms. Knight testified in her deposition that she would not dispute that Phoenix was in default under the terms of the note and stated "I don't dispute that I owe the money and that I haven't paid them."  Plaintiff's Exhibit 10, p. 265.*

Contracts §43.5 (4th ed.)  Phoenix has not cited any authority suggesting that a lender's mistake in quoting a payoff on a loan is such a substantial breach as to be deemed "material" within the meaning of this rule and, indeed, any such suggestion would be contrary to the strong policy of the law against forfeitures.  Further, as noted below, Mooring's application of the payments made by Phoenix was not improper.   While Mooring's actions or inactions, as discussed subsequently, may support a claim based on breach of an implied contractual duty, that breach is insufficient as a matter of law to excuse Phoenix's performance under the terms of the note.  Neither the facts present here, nor the applicable law, warrant application of the "first breach" defense.[9]  The undisputed facts do, however, show a breach by Phoenix of its duty to pay.  The real dispute is over what the unpaid amount is.

Mooring asserts in its motion that the balance due on the note is $259,625.88, as of April 27, 2007.  Phoenix maintains the balance is $231,470.51, with the difference being attributable to a single disputed payment (discussed hereafter) and to the manner in which Mooring applied the payments made by Phoenix after Mooring acquired the note.  The facts show that Mooring applied Phoenix's payments, in their entirety, to accrued interest until the accrued interest was paid current.  Phoenix asserts the payments should have been applied only to one months interest, with the balance of the payment going to reduce principal, based on the manner in which it alleges Bank One previously handled payments.

---

[9]*As noted above, Ms. Knight admitted that she never told Mooring how the payments should be applied or why its balance was inaccurate.  See supra note 6.  See also defendant's Exhibit 2, p. 136.  Further, the confusion as to payoff amount was due, at least in part, to mis-captioned documents filed in the Phoenix bankruptcy.*

The note involved here does not specify how payments are to be applied.  However, Mooring's application to unpaid interest is in accordance with the applicable rule.  In the absence of an agreement to the contrary, a voluntary payment will be applied to the interest, rather than the principal, of a debt.  28 Williston on Contracts, § 72:20 (4th ed.).  "This rule is known variously as the 'United States Rule,' or 'the Massachusetts rule,' and provides that partial payments of a debt apply first to unpaid interest due and thereafter to the principal debt.[10]  *Id.*; *see* <u>Darr v. Muratore</u>, 8 F.3d 854, 861 (1st Cir.1993) (" We note further that the dispute over the terms of repayment ultimately presents not a factual question for a jury but a legal question for the court. While Rhode Island law is unclear on the subject, the normal rule throughout the nation is that, absent an express agreement to the contrary, there is a presumption that loan payments are made to interest first and then principal."); <u>Landess v. State ex rel. Comm'rs of Land Office</u>, 335 P.2d 1077, 1079 (Okla.1958) ("'Under the general rule, partial payments, in the absence of agreement to the contrary, are first applied to discharge interest due; any surplus goes to discharge the principal, the interest being computed thereafter on the balance; and any interest remaining unpaid is not added to the principal for purposes of computing interest.'") (citing 47 C.J.S. Interest § 66. ).[11]

---

[10] *"The rule has ancient roots; it was first acknowledged by the Supreme Court over a century and a half ago." <u>Darr v. Muratore</u>, 8 F.3d 854, 861 n.9 (1st Cir.1993), citing <u>Story v. Livingston</u>, 38 U.S. (13 Pet.) 359, 371, 10 L.Ed. 200 (1839).*

[11] *The note specifies that it is governed by Oklahoma law.  See plaintiff's Exhibit 1(B). As the  parties have cited Oklahoma law in their discussion of Phoenix's counterclaims, the court  assumes it applies to all the claims in this lawsuit.*

The issue therefore becomes whether, as Phoenix argues, an "agreement to the contrary" as to the applicable accounting method was established by Bank One's conduct. In other words, did the bank, by its behavior, supplant application of the United States Rule, which would otherwise govern in circumstances such as these?  Phoenix claims that Bank One accepted its late payments and credited them to its account as if they had been timely made. Phoenix claims that Bank One would apply a late payment "to the oldest monthly obligation owed for principal and interest … never to accrued interest first, then principal." Defendant's response, p. 17.  This conduct, Phoenix asserts, created a course of performance binding on Mooring.[12]

It is less than clear that Bank One's handling of payments to it, in the years on which Phoenix chooses to focus, would be sufficient to establish a course of conduct.[13]  However, it is unnecessary to ultimately resolve that question, as the impact of the confirmed plan of reorganization intervened.  As Phoenix has acknowledged in other contexts, a confirmed plan of reorganization becomes the binding contract between the parties.  Here, the plan determined the amount of the monthly payments and the maturity date, but as to other terms

---

[12]*Phoenix does not cite any authority for its assertion that Mooring stands in the shoes of Bank One insofar as the  application of payments is concerned but, as Mooring does not object, the court assumes that it would be bound by its predecessor's behavior at least to the extent that the behavior was subsequent to adoption of the plan.*

[13]*Large payments appear to have been handled differently than a single month's payment made late.  Ms. Knight also testified that Bank One would treat a late payment as if it had been made on time, if the lapse of payment "probably was not more than three or four months."  Plaintiff's Reply, Exhibit 1, pp. 137-38.*

confirmed the provisions of the contract documents: "All terms and conditions of the existing note, deed of trust and other loan documents shall remain in full force and effect except as otherwise modified by this Plan." Debtor's Fourth Amended Plan of Reorganization, Art. II, B, 1, at p. 4; Exhibit 8 to Plaintiff's brief. Whatever may have been the manner of handling payments prior to the bankruptcy, the Plan made clear that the contract documents controlled thereafter. And as the documents were silent on the manner of payments, the legal presumption noted above applies. The question thus becomes whether Bank One's conduct in the post bankruptcy period established some course of conduct sufficient to make out an "agreement" contrary to the "United States Rule" noted above

The undisputed facts make clear it did not. Phoenix's exhibit designed to show the application of payments by Bank One (Exhibit A to Knight affidavit, Exhibit 1 to Defendant's brief) indicates that Bank One applied all of Phoenix's post-confirmation payments to unpaid interest. (See entries/lines 53 through 82, Exhibit A to Knight aff.).[14] Bank One's treatment of the post-confirmation payments was thus consistent with the manner in which Mooring applied them after it acquired the note. Both lenders applied the Phoenix post-confirmation payments in a manner consistent with the general legal rule. The same

---

[14]_All of the Bank One statements on which Phoenix relies to establish the "course of conduct" are from the pre-confirmation period, except for one (bill date 4/07/02) which states an unpaid balance consistent with post-confirmation application of all payments to interest. Exhibit 23 to Defendant's brief. In the face of these undisputed facts, Knight's conclusory statement to the contrary is of no moment. Knight affidavit, para. 12; Exhibit 1 to Defendant's brief._

facts as to Bank One's conduct preclude Phoenix's alternative argument based on waiver.[15]

As a result, Phoenix's arguments based on application of payments fail; they provide no basis for objection to the balance claimed by Mooring.

Phoenix's remaining defense to the note – unclean hands[16] – lacks factual support.[17] While the evidence before the court shows that Mooring was mistaken as to the account balance, it does not show that its behavior was intentional or fraudulent.

Phoenix's defenses to Mooring's claim on its note and mortgage are insufficient, either factually and/or legally, to avoid liability altogether or to reduce its obligation below the amount calculated by Mooring,[18] with one exception. Phoenix claims that "Mooring has certainly failed to account for at least one $5000 payment."  Defendant's response, p. 16,

---

[15]*The waiver argument is also inconsistent with the notes non-waiver language, also confirmed by the Plan: "WAIVERS.  No waiver by the holder of any payment or other right under this Note or any related agreement or documentation shall operate as a waiver of any other payment or right."  Plaintiff's Exhibit 1(b).*

[16]*Phoenix does not address other defenses it asserted previously and which are discussed by Mooring in its summary judgment brief.  Those defenses, estoppel, accord and satisfaction, laches, novation, and res judicata are deemed waived.*

[17]*Phoenix's breach of good faith and fair dealing defense has been treated as a claim, rather than a defense.*

[18]*In its response to a motion in limine, Phoenix asserts that it asserted unjust enrichment as both an affirmative defense and counterclaim. Doc. #165, p.18.  Neither was pled. See Phoenix's Third Amended Answer and Counter-Claim, Doc. #50.  The statement in defendant's response brief that "Mooring should not be entitled to unjust enrichment ..." is insufficient to assert unjust enrichment as either a claim or defense. Defendant's response, p. 24.*

citing Exhibit B to Knight's affidavit.[19]  Knight also states in her affidavit that "Mooring has still not yet applied a payment made to Bank One, of which they had knowledge, that cleared my Bank on November 13, 2002."  Defendant's Exhibit 1.  The court assumes that Phoenix and Knight are referring to the payment allegedly represented in defendant's Exhibit 8.  That exhibit consists of a page on which a copy of an undated check, a deposit stamp for Bank One with a date of 11/13/2001, and a handwritten note are xeroxed.  Phoenix Central is both the payor and the payee of the check.  The handwritten note states that "altho pd to Phoenix Bank applied to note per memo – see endorsement say commercial payment ~ acct. # is note number."  Defendant's Exhibit 8.  Although the exhibit is not authenticated and the handwritten note is unsigned, the court concludes that it, combined with Ms. Knight's affidavit, suffice to create a fact question as to the amount owed on the note.

Accordingly, Mooring's motion for summary judgment on its claim on the note will be granted in part and denied in part.  It will be granted insofar as Mooring's right to judgment on the note is concerned and as to the propriety of its application of payments.  It will be denied as to the amount due.  The trial as to that issue will be limited to a determination of whether Phoenix made a $5,000 payment for which it has not been given credit and, if so, the impact of that payment on the amount now due. While that payment, if made and not credited, will reduce the amount owed, it will not eliminate the debt.

## PHOENIX'S COUNTERCLAIMS

---

[19]*Mooring states in its reply brief that "[t]he first time this check was produced was when it was attached to Phoenix's Response."  Reply, p. 3 n.1.*

12

Mooring also seeks summary judgment on Phoenix's counterclaims for breach of contract, negligence, tortious interference with business relations and prospective business contracts, and tortious breach of contract,

Phoenix's Breach of Contract Claim

"Every contract carries with it the common law duty to perform with care, skill, reasonable expediency and faithfulness which, if breached, may be treated as a ... breach." Djowharzadeh v. City Nat'l Bank & Trust Co., 646 P.2d 616, 620 n.3 (Okla Civ.App. 1982), citing Oklahoma Natural Gas Co. v. Pack, 186 Okl. 330, 97 P.2d 768 (1939). *See* 12A Okla. Stat. § 1-304 ("Every contract of duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement.").  Viewing the evidence in the light most favorable to the defendant, a jury question exists as to whether Mooring breached its implied contractual obligation of good faith and fair dealing under the promissory note by, among other things, stating an incorrect payoff balance, failing to investigate adequately Phoenix's claim that the balance was incorrect and failing to determine that the plan it was relying on had not been confirmed.[20]  While Mooring disputes that Phoenix has sustained any recoverable damages or can prove it suffered a loss, the court finds the defendant has submitted sufficient evidence of loss to permit its breach of contract claim to be submitted to a jury.  The evidence that Phoenix will be allowed to introduce at trial in support of that claim will be addressed by separate order.

---

[20]*Consistent with the discussion above, Mooring's conduct as to application of payments did not breach any obligation it had.*

Phoenix's Tortious Breach of Contract Claim

As a general rule, the tort of bad faith breach of contract does not apply in the commercial lending setting in Oklahoma. Roberts v. Wells Fargo AG Credit Corp., 990 F.2d 1169, 1174 (10th Cir. 1993). First Nat'l Bank and Trust Co. of Vinita v. Kissee, 859 P.2d 502, 509 (Okla. 1993) ("We made it clear in Rodgers,[21] that our seminal holding in Christian v. American Home Assurance Co.,[22] does not generally apply to the relationship between a bank and its customer."). In order to make out a tort claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must show something more than mere negligence. A showing of "gross recklessness or wanton negligence" is required. First National Bank and Trust Co. of Vinita v. Kissee, 859 P.2d at 509; Rogers v. Tecumseh Bank, 756 P.2d 1223, 1227 (Okla. 1988). Although the court has viewed the evidentiary submissions of the parties in the light most favorable to defendant, it nonetheless concludes that defendant has failed to put forth evidence from which a jury could conclude that Mooring's conduct was anything other than careless or negligent.

Phoenix makes a variety of arguments to suggest wrongful conduct in excess of mere negligence. Rejecting Mooring's position that it was misled by relying on the wrong version of the "Fourth Amended Plan", Phoenix argues Mooring knew the proper interest rate because it had access to the Bankruptcy Court's order denying confirmation of the debtor's

---

[21]*Rodgers v. Tecumseh Bank, 756 P.2d 1223 (Okla. 1988).*

[22]*Christian v. American Home Assurance Co., 577 P.2d 899 (Okla. 1977).*

14

second amended plan, which referenced the rate ultimately adopted in the confirmed plan. Defendant's brief, p. 7. The argument is a classic *non sequitur*. How does knowledge of the second proposed plan, which was rejected, tell a person what would be adopted in a later fourth amended plan? The content of the rejected second plan proves nothing pertinent to the present issue.

Phoenix argues that despite repeated objections to the loan balance, "there is no notation or mention in the Activity Log that Mooring undertook any investigation to resolve no (sic) this dispute or evidence of any returned communication with any representative of Phoenix." Defendant's brief, p. 8. The characterization of the Activity Log and the evidence is at least recklessly, and perhaps deliberately, false. The log entries for 7/16/03, 10/16/03, 11/20/03 and 7/16/04, as well as others, reflect multiple communications with Phoenix representatives on the dispute.[23]

Phoenix argues that Mooring, through Mr. Nalls, "recklessly and knowingly failed to inform the accounting supervisor that the accounting software FAS contained an inaccurate and grossly inflated payoff balance and inaccurate payment history." Defendant's brief, p. 10. However, Nalls testimony, not controverted by Phoenix, was that once Mooring realized there were errors in the FAS, it relied on spreadsheets to analyze the state of the Phoenix loan, not the FAS.

---

[23]*Exhibit 20 to defendant's brief (10/6/03 letter from Evinger to Pfenning) is also flatly inconsistent with Phoenix's assertion that there is "no evidence of any returned communication with any representative of Phoenix."*

Phoenix also claims Mooring failed to provide it with the original Bank One file, despite its repeated requests, and also misled it as to the file's location, telling Phoenix twice it did not have the file when it had been in Mooring's possession since it purchased the loan. However, Nall's testimony cited to substantiate this assertion, defendant's Exhibit 2, p. 105, indicates only that Mooring had not received any new documents from Bank One since February, 2003, not that Mooring had the original Bank One file.  Defendant's former attorney stated that Nalls told him he had the file but then later said he did not have it and could not obtain a copy of it.

In short, the court can discern nothing in the circumstances shown here that goes beyond simple negligence or carelessness on the part of Mooring.  The undisputed facts show that Mooring continued to rely, erroneously, on what it mistakenly believed was the correct plan.   Phoenix continued to object to the payoff quoted, but declined to provide any information as to what Phoenix thought the correct amount was.  Mooring may well have been negligent in these circumstances, but the proffered evidence does not create a justiciable question as to "gross recklessness or wanton negligence."[24] In evaluating summary judgment

---

[24]*At the August 3, 2007, hearing on other motions in this case, counsel for Phoenix asserted that they had other documentary evidence which showed Mooring's knowledge of the proper interest rate in 2003, and which counsel viewed as a "smoking gun."  The description of the evidence at the hearing left the court with considerable doubt that it was any such thing.  In any event, the evidence has not been presented to the court in connection with this motion and defendant must therefore accept the consequences of what was, judging from the hearing reference, a deliberate tactical choice on defendant's part.*

motions, bombast in a brief does not substitute for properly supported facts.[25]

## Phoenix's Negligence Claim

The defendant's negligence claim fails essentially for the same reasons as its bad faith claim.  Recovery in tort for breach of the contract duty to perform the agreement with care, skill and reasonable expediency is generally allowed only when the "breach of contract results from willful, intentional, purposeful or malicious conduct, thus expanding the statutory right to recover punitive damages ordinarily excluded by 23 O.S.1971 § 9 in contract actions."  Djowharzadeh, 646 P.2d at 620 n.3.  Otherwise, imposing "tort liability on a bank for every breach of contract would only serve to chill commercial transactions." Rodgers, 756 P.2d at 1227.

---

[25]*Counsel for defendants would do well to exercise a heightened level of care in their submissions to this court.*

**Phoenix's Tortious Interference Claims**

To establish its claim of tortious interference with business relations, Phoenix must show:

(1) a business or contractual right that was interfered with, (2) interference that was malicious and wrongful and was neither justified, privileged nor excusable, and (3) damage caused by interference.

Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1093 (10th Cir. 2006) (quoting

Brown v. State Farm Fire and Cas. Co., 58 P.3d 217, 223 (Okla.Civ.App.2002)).

To establish its claim for interference with prospective business relations Phoenix must show:

(1) the existence of a valid business relation or expectancy, (2) knowledge of the relationship or expectancy by the [plaintiff], (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage.

*Id.* at 1094 n.24 (10th Cir. 2006) (quoting Boyle Servs., Inc. v. Dewberry Design Group, Inc.,

24 P.3d 878, 880 (Okla.Civ.App.2001)).

Both claims require intentional, wrongful conduct.  Boyle Servs., Inc.,  24 P.3d at 880

("The interference must encompass an unfair or unlawful act or by lawful means without

justification. The interference is intentional if the interferer acted with the purpose to

interfere with the relationship or expectancy.") (internal citation omitted); Waggoner v. Town

& Country Mobile Homes, Inc.,808 P.2d 649, 654 (Okla.1990) ("The tort was first

recognized in Oklahoma in the context of malicious interference with the contractual rights

of a business in Schonwald v. Ragains, 32 Okl. 223, 122 P. 203 (1912). That decision defined

the element of 'malice,' for malicious interference, as 'an unreasonable and wrongful act

done intentionally, without just cause or excuse.'" (quoting <u>Schonwald</u>, 122 P. at 210.)). Yet Phoenix has not offered any evidence that Mooring intentionally interfered with any business projects. Phoenix asserts that Mooring "knowingly sent out statements with incorrect balance to ... potential third party lenders," defendant's response, p. 20, citing Nalls deposition testimony and the letter to Structured Lending dated April 12, 2004.  However, Nalls testified that he became aware in December, 2005, that Mooring had the wrong Plan and learned of the additional $15,000 in payments in January, 2006.  Defendant's Exhibit 2, pp. 89-90.  That was <u>after</u> the payoff balance was sent to Structured Lending.  No evidence is cited that shows when Mooring sent Union Bank the incorrect balance.[26]  The evidence before the court falls short of that required to permit a tortious interference claim to be submitted to a jury.

## SUMMARY

Based on the foregoing, plaintiff's motion for summary judgment [Doc. #120] is **GRANTED in PART** and **DENIED in PART**, as follows: the motion is **GRANTED** insofar as plaintiff's right to judgment on the note is concerned and as to the propriety of its application of payments, but **DENIED** as to the amount of the unpaid balance, with the determination of that amount being limited to the dispute noted above.  The motion is **GRANTED** as to defendant's counterclaims, with the exception of its contract claim for

---

[26]*However in the flurry of pretrial motions and responses that were filed, Phoenix produced a commercial loan worksheet and credit review memo related to the loan request it submitted to Union Bank.  They bear dates of 11/30/04 and 6/22/2004, both of which were before Mooring discovered its error in the loan balance.  See Doc. #165, Exhibit 6. See also Doc. #165, p.13 n.5 ("April, 2004 was the first date that Phoenix sought refinancing with Structured Lending and Union Bank.") and n.6.*

breach of the contractual duty of good faith and fair dealing, as to which the motion is **DENIED**.  The various questions as to the nature and extent of damages recoverable on the counterclaims are dealt with by separate order.

**IT IS SO ORDERED**.

Dated this 7th day of August, 2007.

JOE HEATON
UNITED STATES DISTRICT JUDGE